Filed 2/23/15  Marriage of Houston CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of MASAKO HOUSTON and JOHN FRANCIS HOUSTON III. | |
| MASAKO HOUSTON,<br><br>    Respondent,<br><br>v.<br><br>JOHN FRANCIS HOUSTON III,<br><br>    Appellant. | A138484<br><br>(San Mateo County<br> Super. Ct. No. FAM0114545) |

After 19 years of marriage, John Francis Houston III (husband) and Masako Houston (wife) separated on July 19, 2011.  Wife later filed a petition for dissolution of

In this dissolution of marriage action, John Francis Houston III appeals from a judgment dated March 28, 2013, which, in pertinent part, (1) directed him to pay $2,100, as a monetary sanction pursuant Code of Civil Procedure section 2023; (2) awarded spousal support to his wife Masako Houston; and (3) denied his request for reimbursement of certain separate property funds he allegedly contributed to the community and his share of community funds that wife allegedly used for her personal expenses after the parties' separation.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND[1]**

After 19 years of marriage, John Francis Houston III (husband) and Masako Houston (wife) separated on July 19, 2011.  Wife later filed a petition for dissolution of

---

[1]     We set forth only those facts necessary to resolve the issues raised on this appeal.

1

the marriage on August 9, 2011. The parties had one child, who was then eleven years old.

Based on the parties' requests concerning temporary spousal support, the trial court initially issued an order directing husband to pay wife temporary support in the sum of $981 per month, commencing May 1, 2012. After an evidentiary hearing, the court reduced wife's temporary support to $875 per month, commencing May 1, 2012 through July 31, 2012, with the amount reduced to $818 per month beginning August 1, 2012, "so long as" husband provided written verification to wife of the increase in his "mandatory retirement deductions." Husband was awarded a credit against the support he had already paid for the months of May, June and July, 2012, and any overpayment was to be credited against the next month's support payment.

On February 13-14, 2013, a short cause trial was held on the parties' outstanding financial requests. The court heard testimony from several witnesses including wife and husband, and considered over 35 exhibits admitted into evidence. After consideration of the parties' objections to its tentative decision, the court issued its final "Findings and Orders After Hearing."

Addressing the parties' financial status, the court stated: "[Wife] works as a Japanese language interpreter and translator. She has worked in this field for over 20 years. She has worked as a self employed individual and, since 2012, as a Subchapter S Corporation named AsiaLink Language Services. [¶] The court finds that [wife] is using her best efforts to maximize her income and there is no reason to impute any additional income to her other than what she is actually earning. [¶] According to her 2012 income tax returns, [wife] had $46,706 in salary plus $45,428 in business income. The business income figure must be adjusted for the following reasons: [¶] 1. Add back $6,100 that was deducted for use of her personal residence. [¶] 2. Add back $1,831 that was deducted for her business suits and clothing. [¶] 3. Add back $102 that was deducted for washing her car. [¶] 4. Add back $33 that were gifts to the child care provider written off as business gifts. [¶] 5. Add back $243 for taxi expenses in Las Vegas that appear to be non-business related (calculated by taking one-half of the claimed expense). [¶] 6. Add back

2

$450 that was deducted for the residence appraisal. [¶] 7. Add $8,741, consisting of $600 and $8,141, received in October for income received that was not accounted for in the tax return. [¶] With the above adjustments of $17,500, the court finds that [wife's] taxable business income for 2012 was $62,928. [¶] . . . [¶] [Husband] is employed by UCSF. His monthly income is $10,840. The court does not use his year to date income as that figure appears to include one month's income from the previous year. [Husband] has no regular bonus income and has once received a $1,000 payment for an innovative idea submitted to his employer."

In issuing the guideline child support order, the court found: "[Wife] has annual employment income of $46,706 or $3,892 per month plus annual business income of $62,928 or $5,244 per month. She has contributions to her SEP-IRA of $11,500 or $958 per month. She has estimated health insurance expenses of a mid-range of $850 per month. She will file her tax returns as Head of Household and claim[ ] the minor as a dependent in odd numbered years and as single with one exemption in all even numbered years. [¶] [Husband] has monthly income of $10,840. He contributes $295 per month to voluntary retirement and $523 per month to a mandatory retirement program. He has monthly health insurance expenses of $576 per month. He has monthly property tax expenses of $1,194 and monthly mortgage interest expenses of $2,506. [He] will file his income taxes as single with one exemption in odd numbered years and head of household with two exemptions in even numbered years. [¶] Based upon the above findings, [husband] shall pay to [wife], commencing March 1, 2013, the sum of $194.00 per month [²] as and for child support payable on the first of each month until emancipation of the minor or further order of the court."

In awarding wife spousal support for eight years, the court found: "The incomes of the parties are discussed above. [¶] This is a long term marriage, the parties having been married on July 18, 1993 and separated on July 19, 2011. [Wife] is 47 years old and

---

²     At this point in the court's decision, the court included a footnote stating, "See the computer printout attached hereto as 'Attachment Two'." The attachment two was a printout of the "DissoMaster Data Screen" dated February 18, 2013.

in good health. [Husband] is 46 years old and in good health. [¶] The parties enjoyed an upper middle class standard of living. They enjoyed joint and separate vacations. Significant sums were invested into the remodel of their home. They were able to contribute to retirement plans and had some savings. They currently have essentially matching values of assets. [¶] Based upon the parties' current financial situations and the factors discussed above, [husband] shall pay to [wife] the amount of $450.00 per month commencing March 1, 2013, as and for spousal support. Said amount shall continue until the death of either party, [wife's] remarriage, further order of the court or January 1, 2021, whichever event first occurs."

Concerning the division of the parties' assets and liabilities, the court found the marital residence had a fair market value of $1,100,000. The balance of the existing mortgage and line of credit was $677,000, and therefore the equity in the property was $423,000. Husband was given the right to purchase wife's interest for $211,500. In the event husband did not exercise his right to purchase, the house was to be sold in an "as is" condition. The court found husband did inherit $33,000 from his grandmother in 2003. But, husband's request for reimbursement was denied because he "was unable to adequately trace these funds into the payoff of the then second deed of trust" on the marital home. The court also directed husband to pay to wife "the sum of $2,100 as a monetary sanction pursuant to the provisions of Code of Civil Procedure Section 2023 for expenses incurred in bringing the Motion in Limine regarding the attorney client privilege issue." After entry of judgment on March 28, 2013, husband filed a timely notice of appeal.

## DISCUSSION

### I. Sanctions Imposed on Husband Related to Wife's Motion In Limine to Exclude Certain Evidence Pursuant to Attorney-Client Privilege

#### A. Relevant Facts

In early July 2011, wife called an attorney to discuss the dissolution proceeding. The attorney sent wife "a detailed intake form, titled 'Personal Information' " (PIF), which was described as an 8-page document consisting of numerous questions regarding

4

the marriage and wife's position in the dissolution proceeding. Before meeting with counsel, wife downloaded the completed PIF to a flash drive[3] (hereafter referred to as USB stick), which had a UCSF General Hospital logo on it. Wife found the USB stick lying on the garage floor in the marital residence. When she first plugged the USB stick into her computer, there was no information stored on it.

After wife met with counsel on July 8, 2011, she decided not to hire him and retained another attorney. Wife met with her new counsel on July 21, 2011, and discussed the information contained in the PIF during their consultation. Wife continued to use the USB stick to retain all of the records including the PIF and communications between her and counsel. Wife never left the USB stick in an open space, but kept it hidden in various areas of the house, the last place being inside a brown cloth bag inside her closet underneath her clothes

In early September 2011, wife sought a restraining order against husband, and she stayed away from the marital residence for four days until the court granted her request. When wife returned to the marital residence, she realized husband had rummaged through her closet, drawers, and all of the bags in her bedroom, including the brown bag containing the USB stick. When wife looked inside the brown bag, she saw that missing from the bag were several items including the USB stick.

Later, in response to wife's request for the production of documents that husband intended to use at trial, he produced a copy of wife's completed PIF. Wife's counsel asked husband to return or destroy the PIF, informing husband that the document was protected attorney-client information. At a January 18, 2013 mandatory settlement conference before the trial court, husband confirmed he had the PIF and the USB stick. He refused to return or destroy the PIF, claiming he had spoken with five attorneys, all of whom told him the document was not privileged. At that conference, the trial court

---

[3] "A 'flash drive' is 'a data storage device that uses flash memory; *specifically*: a small rectangular device that is designed to be plugged directly into a USB port on a computer and is often used for transferring files from one computer to another.' (<http://www.merriam-webster.com/dictionary/flash%20drive> [as of Oct. 3, 2014].)" (*People v. Michael E.* (2014) 230 Cal.App.4th 261, 264, fn. 1.)

basically stated that although no evidence had yet been presented, it believed the PIF was covered by the attorney-client privilege and a motion in limine would be appropriate. Although wife's counsel asked husband to withdraw, destroy or return the PIF, he refused to do so.

On February 7, 2013, wife filed a motion in limine to exclude evidence of the information in the PIF on the grounds it was covered by an attorney-client privilege. Wife also asked the court to order husband to pay a monetary sanction, pursuant to Code of Civil Procedure section 2023.030, subdivision (a), of $2,100 for attorney fees ($350 per hour for six hours of work) spent on research and drafting the motion in limine.

On February 13, 2013, before the trial, the court heard argument addressing wife's motion in limine. Husband opposed the motion, arguing that the USB stick "most certainly was not left on the garage floor" but had fallen out of his brief case or been taken from his brief case. He also asserted that the USB stick was not empty but had been used by him "for financial presentations," albeit he admitted that "the actual file in question was actually put into the folder that is clearly Japanese characters and [he had] no ability to create a folder in Japanese." He also argued the PIF was not privileged as wife had taken no special precautions to preserve or ensure the confidentiality of the information, left the USB stick in a location to which husband and even their son clearly had access, mingled the PIF with husband's documents, failed to maintain control over the PIF, and downloaded the PIF onto a USB stick that did not belong to her.

The trial court rejected all of husband's claims, ruling that: "It isn't whether [the USB stick] had your information or not and whether you found it in a drawer or whether it was in your brief case. The question is really was this information that clearly was between her and her attorney and part of her putting her case together was it inadvertently or was it intentionally given to you so that you could look at it because that's the question. If it was paperwork and she left it on the kitchen table, you [would not] be able to use it even though she – it was a mistake perhaps to leave it on the kitchen table. But . . . you don't lose your privilege because you inadvertently let someone have . . . it. I've seen cases where somebody mails it to somebody by mistake and that person's obligation

6

is to return it. [¶] So regardless of whether it was on your drive or with your information it[ ] still appears to the Court that it was not intended to be given to you so that you could review it." The court further found that the information in the PIF was protected by the attorney-client privilege even if wife did not hire the attorney who originally gave her the form. The court concluded, "the information, clearly as the Court sees it, is protected by the attorney-client privilege and you inadvertently were given access to it but that doesn't waive the confidentiality." The court granted the motion in limine precluding husband from using the information on the PIF during the trial and noted that the issue of monetary sanctions would be considered at the end of the trial.

At the conclusion of the trial on February 14, 2013, wife requested an award of $2,100 for the time her counsel spent drafting the motion in limine particularly after the court had explained to husband during the mandatory settlement conference that the PIF was a privileged document, and his insistence on using the document at trial required wife to file the motion in limine. Husband conceded the court had discussed the issue in chambers before wife filed her motion in limine, but he argued that he had not been allowed to present arguments at the chambers conference. He further argued he had not done anything intentionally to cause distress or to be discourteous to any one or the system.

In his objections to the court's tentative decision awarding wife sanctions of $2,100, husband argued wife never established that the PIF was a communication from client to attorney because it was not "an email, nor is there any indicia of it being a communication to an attorney given the lack of any identifying language referring to an attorney." He also argued the PIF was not meant to be confidential for the following reasons: "First, . . . [t]here is no reason for it to have been placed on a USB drive instead of kept on the computer hard drive. Second, and more importantly, it was placed on [husband's] USB drive. If this was meant to be kept from [husband], it should not have been placed on his flash drive." He further argued that what was communicated between client and attorney would be protected, but the document itself is not protected. "Somewhat of a fine distinction, but an important one for these reasons [husband] is

7

asking that the sanctions be lifted." Wife filed a reply, arguing that the court had resolved the status of the PIF both before trial and in its ruling on the motion in limine, and she sought an additional $5,000 payable by husband as sanctions for forcing her to file a reply to his objections to the court's tentative decision. As noted, in its decision, the court directed husband to pay $2,100 "as a monetary sanction pursuant to the provisions of Code of Civil Procedure Section 2023" for expenses incurred by wife in filing the motion in limine. The court did not grant wife's request for additional sanctions of $5,000.

### B.    Analysis

"In general, when a party asserts the attorney-client privilege, that party has the burden of showing the preliminary facts necessary to support the privilege. [Citation.] The necessary preliminary facts include the existence of the attorney-client relationship at the time the confidential communication was made. [Citation.] After this burden is met, or where there is no dispute concerning the preliminary facts, the burden shifts to the party opposing the privilege to show either the claimed privilege does not apply, an exception exists, or there has been an express or implied waiver." (*Venture Law Group v. Superior Court* (2004) 118 Cal.App.4th 96, 102 (*Venture Law Group*).)

Evidence Code section 912, subdivision (a), provides, in pertinent part, that "the right of any person to claim a privilege provided by Section 954 (lawyer-client privilege) . . . is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege." "The statute clearly provides that it is the holder of the privilege, in this case the client [wife] (Evid. Code, § 953), who may waive the privilege, either by disclosing a significant part of the communication or by manifesting through words or conduct consent that the communication may be disclosed by another. The language of the statute indicates that

8

we are to look to the words and conduct of the holder of the privilege to determine whether a waiver has occurred." (*State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644, 652 (*State Comp. Ins. Fund*).) Pertinent to our discussion, "[a] trial court called upon to determine whether inadvertent disclosure of privilege information constitutes waiver of the privilege must examine both the subjective intent of the holder of the privilege and the relevant circumstances for any manifestation of the holder's consent to disclose the information." (*Id.* at pp. 652-653; see *Roberts v. Superior Court* (1973) 9 Cal.3d 330, 343 [waiver of a privilege "must be a voluntary and knowing act done with sufficient awareness of the relevant circumstances and likely consequences"]; *Shooker v. Superior Court* (2003) 111 Cal.App.4th 923, 928 [privilege may be lost by an express or implied waiver].) [4]

In challenging the ruling on wife's motion in limine, husband argues the trial court should have denied the motion because she waived her attorney-client privilege with regard to the information in the PIF that was downloaded onto the USB stick. According to husband, the privilege should be deemed waived for two reasons: (1) wife failed to take any reasonable steps to avoid disclosure because she placed the completed PIF on a flash drive belonging to husband; and (2) there is a serious question as to whether disclosure was "even 'inadvertent' " because wife left the flash drive at the marital residence when she departed. We conclude husband's arguments are unavailing. The

---

[4]     As further explained by the court in *State Comp. Ins. Fund, supra*, 70 Cal.App.4th at pp. 652-653, fn. 2:  " 'Courts faced with the issue of whether intent is necessary to effectuate a waiver of the attorney-client privilege by inadvertent disclosure have approached the problem in one of three ways.  Some courts have followed a "strict responsibility" approach, viewing the client's intent as irrelevant. . . . Other courts have used a balancing approach. . . . Under the balancing approach, several objective factors may be considered in rendering a decision. . . . A third group of courts have focused specifically upon whether the client intended to waive the privilege. . . . Regardless of the approach used, the final determination of whether an assertion of the attorney-client privilege will be upheld in an advertent disclosure context depends upon whether the client either expressly or impliedly waived the privilege.' (Ayres, *Attorney-Client Privilege: The Necessity of Intent to Waive the Privilege in Inadvertent Disclosure Cases* (1986) 18 Pacific L.J. 59, 60-61.)"

trial court found the information in the PIF was protected by the attorney-client privilege, that wife did not intend by her conduct or statements to waive the privilege, and husband's inadvertent access to the PIF did not waive the privilege. The trial court was free to reject husband's argument that the privilege was waived by wife's use of husband's USB stick and her conduct of leaving the USB stick in the house. Instead, the trial court could reasonably find that those factors, either singly or together, were not sufficient indicia of a waiver of the privilege. As husband correctly concedes, we review the trial court's determination for an abuse of discretion. (*Venture Law Group, supra*, 118 Cal.App.4th at p. 101.) Thus, "we ask whether the trial court's findings of fact are supported by substantial evidence, whether its rulings of law are correct, and whether its application of the law to the facts was neither arbitrary nor capricious." (*People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 746.) We see no basis to reverse the trial court's ruling that wife did not waive the attorney-client privilege.

Husband also argues that the trial court's ruling constitutes reversible error because "[t]he purported privileged document contained an admission that the husband's inheritance was in fact used to pay off the second mortgage," which was "a disputed issue at the trial, and one on which the trial decided against the husband." However, " '[t]he privileges set out in the Evidence Code are legislative creations; the courts of this state have no power to expand them or to recognize implied exceptions.' [Citations.] Public policy supports the proper scope of application of attorney-client privileges, to ensure ' "the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." ' " (*Seahaus La Jolla Owners Assn. v. Superior Court* (2014) 224 Cal.App.4th 754, 766-767.) Even assuming the PIF contained an admission by wife regarding the source of funds used to pay a mortgage, "[t]here is no statutory waiver in such circumstances, and no basis for creating a nonstatutory waiver. To do so would create an intolerable burden upon the attorney-client privilege, making it very difficult for the parties to the relationship to openly discuss matters which might

10

eventually lead to litigation." (*Miller v. Superior Court* (1980) 111 Cal.App.3d 390, 394-395.)

Husband also complains there was no basis for an award of monetary sanctions under the Civil Discovery Act because there was no discovery violation, there was no misuse of the discovery process, there was no effective motion for sanctions, the PIF provides no indicia of being a privileged document, wife never set forth a basis for a claim of privilege, the determination that the privilege applied was erroneous, and even if this court disagrees regarding the PIF's status, husband's position was substantially justified such that he was entitled to a judicial determination of the issue. We conclude husband's arguments do not require reversal.

Code of Civil Procedure "[s]ection 2023.030, subdivision (a), authorizes the trial court to impose a monetary sanction representing 'the reasonable expenses, including attorney's fees, incurred by anyone as a result' of a party's misuse of the discovery process." (*Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 294 (*Parker*).) Evidence Code section 954 provides that "a client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer." Wife learned of husband's intent to introduce the PIF during trial in response to her request for the production of documents that husband intended to use at trial. (Code Civ. Proc., § 2019.010, subd. (a) [methods of discovery include "[i]nspections of documents . . ."].) Because husband already had the PIF and refused to withdraw it, wife's motion in limine was the proper way to remedy the problem. By its ruling the trial court in effect found that husband's conduct was, in effect, a defined misuse of the discovery process, which includes "[p]ersisting, over objection and without substantial justification, in an attempt to obtain information or materials that are outside the scope of permissible discovery." (Code of Civ. Proc., § 2023.010, subd. (a).) Additionally, the record establishes that husband read wife's motion papers and was aware of both the factual and statutory bases for the requested monetary sanction. At no time did he lodge an objection to the sufficiency of the motion papers and he did not request a continuance. Consequently, we deem husband's claims

11

regarding lack of proper notice forfeited. (See *Reedy v. Bussell* (2007) 148 Cal.App.4th 1272, 1288.) We also reject husband's argument that monetary sanctions could not be awarded as a matter of law because he was substantially justified in seeking a judicial determination concerning the PIF's status. Code of Civil Procedure section 2023.030, subdivision (a), requires the trial court to impose monetary sanctions "unless [the court] finds that the one subject to the sanction acted with substantial justification." But, "[t]he court need not make an explicit finding the exception [for acting with substantial justification] does not exist as this is implied in the order awarding sanctions." (*Parker, supra,* 149 Cal.App.4th at p. 294.) By its ruling here, the trial court found husband's position regarding the nonprivileged status of the PIF was not substantially justified. We see no basis to reverse the trial court's ruling on this ground.

## II. Trial Court's Award of Spousal Support to Wife

In challenging the award of spousal support to wife, husband first sets forth our standard of review and the statutory language in Family Code sections 4320 and 4330, subdivision (a). He then argues the trial court committed reversible error by failing to consider the factors in Family Code section 4320, noting that the court cannot substitute a computer program (for example, the DissoMaster) or use the amount of temporary support in awarding support in its final order. However, to support his contentions, husband does not provide any citations to the record in the argument section of his briefs, as required by California Rules of Court, rule 8.204(a)(1)(C).[5] (See *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239.) As an appellant, husband "must do more

---

[5] California Rules of Court, rule 8.204(a)(1) reads, in pertinent part: "Each brief must: [¶] . . . (C) Support any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." Nor do we see any merit to husband's argument in his reply brief that there are several areas in which wife's responsive brief allegedly takes liberty with the facts. The fact that wife's responsive brief may suffer from deficiencies similar to those in husband's opening brief is of no moment. As an appellant, husband has the burden of demonstrating he is entitled to relief. He cannot demonstrate reversible error by arguing that wife has not addressed, or adequately addressed, contentions for which he does not present in his opening brief cogent arguments supported by citations to the record.

than assert error and leave it to the appellate court to search the record . . . to test his claims. The appellant must present an adequate argument including [page] citations to . . . relevant portions of the record" in the argument section of the briefs. (*Yield Dynamics, Inc. v. TEA Systems Corp*. (2007) 154 Cal.App.4th 547, 557.) In all events, we see no merit to husband's contentions. We find nothing in the trial court's final decision indicating its award of spousal support to wife was based on either the DissoMaster or the temporary spousal support order. The trial court's reference in its final decision to the DissoMaster computer printout was only to support the award of child support. By his other arguments, husband in effect asks us to reweigh the evidence, which we decline to do. (See *In re Marina S*. (2005) 132 Cal.App.4th 158, 165 ["[a]n appellate court does not reweigh the evidence"].)

## III.    Distribution of Community Assets and Funds

### A.    Reimbursement of Husband's Inheritance Funds

#### 1.    Relevant Facts

At trial husband sought reimbursement of $33,000, described as inheritance funds he received from his grandmother, which money he claimed was used to pay off a mortgage loan on the marital residence. Husband's brother David Houston (David) testified that in 2003, both he and husband each received $33,033.40 as an inheritance on the death of their grandmother. David deposited his share of his inheritance in his own bank account on August 4, 2003. David did not have a bank statement for husband showing a similar deposit. Husband testified that upon receipt of an inheritance of $33,000 from his grandmother, he initially invested the funds in a money market account in his name to earn some interest before deciding what to do with the funds. He did not recall at any time putting the money into a joint checking account that would earn little to no interest as "that just is silly to do with $33,000." The money was kept in the money market account for one year. When the parties decided what they wanted to do with the funds, husband "wrote a check, transferred the money into [his] account and [he] wrote a check to the mortgage company and paid the bill" in August 2004. The parties owed about $40,000 on the loan so they had to pay additional cash. Husband explained he had

kept his grandmother's will and the loan payoff documents in a fireproof safe in the house. After the parties separated, husband was forced to leave the house for some time and when he returned the documents were missing from the safe. Wife testified that she recalled husband had received funds from his grandmother but she did not remember the exact amount. Husband told her that he was going to put the inherited funds into the parties' joint checking account. About two to four months after husband received his inheritance, he made a payment on one of the mortgages on the marital residence. Wife did not know the amount of the payment. From the time husband deposited the inherited funds into the joint account until he made the mortgage payment, the parties used the joint account for paying their monthly family living expenses. Both parties made regular deposits to this account. Husband arranged for his paycheck to be directly deposited into this account. Wife never agreed with husband that he would be entitled to reimbursement for the inherited funds. As noted, the court expressly denied husband's claim for reimbursement of the inherited funds on the ground he was "unable to adequately trace" the use of the inherited funds to pay the mortgage on the marital residence.

### 2. Analysis

Family Code section 2640 provides, in pertinent part, that "[i]n the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate *to the extent the party traces the contributions to a separate property source*." (*Id*., subd. (b); italics added.)" (*In re Marriage of Perkal* (1988) 203 Cal.App.3d 1198, 1201-1202 [discussing predecessor statute to Fam. Code, § 2640, Civil Code former § 4800.2].) "Whether the spouse claiming a separate property interest has adequately traced an asset to a separate property source is a question of fact for the trial court, and its finding must be upheld if supported by substantial evidence." (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823 (*Braud*).) "Either of two tracing methods may be utilized to characterize the disputed property interests: 'direct tracing,' or 'family living expense tracing.' " (*Ibid.*) "Under the 'direct tracing' method, the

14

disputed asset [(in this case the mortgage on the marital residence)] is traced to the withdrawal of separate property funds from the commingled account. This method requires *specific records* reconstructing each separate and community property deposit, and each separate and community property payment as it occurs. Separate property status cannot be established by mere oral testimony of intent or by records that simply total up all separate property funds available during the relevant period and all the separate expenditures during that period; such records do not adequately trace to the source of the purchase at the time it was made." (*Ibid.*) "Under the 'family living expense' or 'recapitulation' method, it is assumed that family living expenses are paid out of community property funds. [Citations.] Payments may be traced to a separate property source by showing community income at the time of the payments . . . was exhausted by family expense, so that the payments . . . necessarily must have been made with separate property funds. [Citations.] The recapitulation must be sufficiently exhaustive to establish not only that separate property funds were available to make the payments, but that they were actually used. [Citation.] As with direct tracing, the record must demonstrate that community income was depleted at the time the particular asset was acquired." (*Id*. at pp. 823-824.)

Husband argues there was no need for him to produce specific records of tracing in the trial court because "[t]there is no showing of any commingling in this case. The only evidence on this point is undisputed and unimpeached" and "[i]t appears that the trial court accepted the fact that there was no commingling." We disagree. The trial court was free to reject husband's testimony that he had not commingled his inheritance funds in a joint bank account. "As the trier of fact in this case, the trial judge was the exclusive judge of the credibility of the evidence. [Citation.] In that role, the judge may reject any evidence as unworthy of credence, even uncontradicted testimony." (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 979.) By ruling that husband had not adequately traced the inherited funds, the trial court necessarily and reasonably found, based on wife's testimony, that husband's inherited funds were commingled with community funds in the parties' joint bank account from which household expenses were

15

paid. Even assuming the parties had intended the inherited funds be used to pay a mortgage, husband's "testimony that he intended the funds withdrawn from his separate property account [to be used to pay a mortgage] was plainly insufficient to support a finding that the [$33,000] was actually used for that purpose. And there were no records to prove that the community funds in the [parties' joint bank account] had been depleted at the time" the mortgage payment was made. (*Braud, supra*, 45 Cal.App.4th at p. 824.) Consequently, based on this record, we conclude the trial court did not err in denying husband's claim for reimbursement of $33,000.

> **B.    Reimbursement for Husband's Alleged Payment of Community Expenses and Wife's Alleged Use of Community Funds for Her Personal Expenses After Parties' Separation**

> **1.    Relevant Facts**

In his trial brief filed on February 6, 2013, husband asserted that during the time period of July 2011 and October 2011, wife did not contribute any money to the joint checking account from which husband paid the household bills and mortgages. He also asserted that wife had "moved" the second mortgage to the joint checking account presumably so that husband could pay that expense as well. According to husband, the expenses were $20,816.52, of which he was seeking $10,408.26. "Examples of expenses that [husband] paid exclusively were the mortgages, [wife's] American Express Card, Baseball for our son, [wife's] hair dresser, insurances (except health), a personal check written to [wife] in the amount of $2,000, and utilities to name a few."

During the trial husband asked the court to direct wife to reimburse him the sum of $4,875 for mortgage payments and the other expenses that he had paid from the parties' joint checking account after separation. He asserted that 100 percent of his pay check was deposited in that account and he paid for all the bills from that account. Based on the July 20, 2011 bank statement, husband asked for $2,365, which represented expenses paid for joint obligations and wife's personal expenses. However, the checks reflected on the July 20, 2011 bank statement were all dated in May 2011 and June 2011, which predated the parties' separation. Based on entries in the August 20, 2011 bank statement,

husband asked for $4,875, which represented one-half of mortgage and other shared obligations, including a check that wife wrote to herself for $2,000, for which husband sought return of the entire sum. Based on entries in the September 20, 2011 bank statement, husband asked for $1,823, which represented one-half of mortgage and other shared obligations. Based on entries in the October 20, 2011 bank statement, husband asked for $2,144, for shared obligations.

In his objections to the court's tentative decision, husband argued that "[f]rom July 2011 to October 2011" after the parties decided to divorce, they were supposed to share all expenses equally, but they were actually living solely on funds provided by husband. Husband noted the court was given bank statements for the months in question, but husband was not given any credit for his payment of all expenses. Husband sought reimbursement of $10,408.26, representing one-half of expenses of $20,816.52. At a minimum, husband sought $4,623.13, representing one-half of the mortgage payments for those months, consisting of "four months at $2[,]061.45," and "one month at $1[,]001.46 after [wife] had the [second] mortgage transferred to the joint account." Husband also claimed that in August 2011, wife wrote herself a check in the amount of $2,000, as shown on that bank statement, the money had never been returned to the joint bank account, and husband was asking for one-half of those funds to be returned to him.

In reply to husband's objections, wife asserted there was no agreement that after the parties decided to divorce that they would share expenses equally. Wife was struggling to support herself in addition to paying the second mortgage on the house, which fact husband conveniently failed to tell the court. Husband did not start paying wife support until "April of 2012." It was argued that had husband been paying wife support, she would not have needed to withdraw money from the joint bank account. Wife continued to pay the second mortgage ($1,200) at this time during her slow season. In its final decision, the trial court made no mention of husband's claims for reimbursement.

17

## 2. Analysis

Husband argues the trial court erred in failing to require wife to reimburse him for certain payments he made for the period after the parties' separation until October 2011 for preexisting community obligations, known as *Epstein* credits (*In re Marriage of Epstein* (1979) 24 Cal.3d 76 (*Epstein*)). However, it is well settled that reimbursement for *Epstein* credits " 'should not be ordered where the payment on account of a preexisting community obligation constituted in reality a discharge of the paying spouse's duty to support the other spouse or a dependent child of the parties. Both spouses have a duty to support their dependent children. [Citation.] Similarly, the spouses owe to each other mutual duties of support. [Citation.] Following separation, the preferred source for payment of support is the separate property of the supporting spouse that would have been community property if the spouses were not separated. [Citation.] Payment of a debt, of course, may constitute payment of spousal or child support. [Citations.] When in fact it does, reimbursement is inappropriate.' " (*Id*., at p. 85, quoting from *In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 747-748.) Here, the trial court could have reasonably found that an award of *Epstein* credits was not warranted because husband was not paying spousal or child support for the period after the parties' separation through October 2011.

Husband also argues he is entitled to reimbursement for wife's use of community funds for her personal expenses after the parties' separation. He specifically contends that wife wrote a check to herself for $2,000 in August 2011, as shown on a bank statement for that month, and he is entitled to be reimbursed one-half of that sum, i.e., $1,000. He also contends wife used community funds of $3,500 to pay a retainer fee for one of her counsel, and he is entitled to be reimbursed one-half of that sum, i.e., $1,750. In support of his contentions, however, husband does not cite in his appellate briefs to any portion of the evidence establishing either (a) wife used the $2,000 check for her personal expenses and not for community expenses or (b) wife used community funds to pay her attorney's retainer fee. In support of those specific claims, husband cites only to a statement in his trial brief and his objection to the court's tentative decision. However,

18

those portions of the record are argument, and not evidence supporting his claims. (See *In re Marriage of Duris & Urbany* (2011) 193 Cal.App.4th 510, 515 ["allegations of a brief are not evidence"].) As we have noted, as an appellant, husband "must do more than assert error and leave it to the appellate court to search the record . . . to test his claim[s]. The appellant must present an adequate argument including [page] citations to . . . relevant portions of the record." (*Yield Dynamics, Inc. v. TEA Systems Corp., supra,* 154 Cal.App.4th at p. 557.) Consequently, we will not address these reimbursement claims.

## DISPOSITION

The judgment is affirmed. Respondent Masako Houston is awarded costs on appeal.


_____
Jenkins, J.


We concur:


_____
Pollak, Acting P. J.


_____
Siggins, J.

19